## TOM JONES V. STATE.

### No. 2049.   Decided January 22, 1913.

**Rape by Force—Insufficiency of the Evidence.**

Where the testimony of the prosecutrix rendered it improbable, if not impossible that the offense of rape by force was committed upon her, and defendant's testimony showed an alibi and good reputation, the conviction was not sustained. Prendergast, Judge, dissenting.

Appeal from the District Court of Panola. Tried below before the Hon. W. C. Buford.

Appeal·from a conviction of rape by force; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*J. H. Long* and *T. P. Long*, for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction was for rape by force, appellant receiving a term of five years confinement in the penitentiary.

The only question presented for revision is the sufficiency of the evidence to justify the verdict. The prosecutrix, Lemmie Allison, was shown by the evidence to be over sixteen years of age. On the 21st day of October, 1911, appellant came to the home of her father. When she first discovered him he was "standing on the door block." She turned and "looked at him and he asked me to give him some. I told him I wasn't studdying him. He then came on in the kitchen where I was and caught hold of me, one hand at my throat and the other around me. My sickness was on me at this time. He threw me down and when he hurt me I bit and began scratching him, and he then got up and I grabbed a board and hit him with it and he ran away. I then went down into the cotton patch where my mother and father and Wm. Powell were and told them Tom Jones had been up there where I was. It was about 11 o'clock on Friday, October 21, 1911. He went about half way in. He got on top of me and he put his thing in mine. I tried to hollow, but I could not, for he was choking me. Just as soon as I got aloose from him and had run him off, I went to the field and told my mother. My mother examined my privates as soon as we got back to the house. I did everything I could to keep him from raping me, and I did not consent to his having intercourse with me. I have known Tom Jones some time; he used to go with me. When he told me to give him some I told him I wasn't studdying him. I did not hollow or make any outcry when he came on into the room. I just kept on telling him I wasn't studdying him. He grabbed me then and threw me on the floor. His left hand was around me but

don't know where his right one was. He got my drawers off but never got my dress above my knees. He did not get my legs apart but they were right close together all the time. When he got on top of me he hurt me. Don't know what he hurt me with, but when he hurt me I bit him and he got up and I grabbed a board and hit him side the head and he ran off. He got off of me just as soon as I bit him, and I bit him just as soon as he got on top of me. I know he went into me half way because my mama examined me and she told me so, and she also told me to swear that he went into me half way. I never did hollow or cry out, because I could not; he was choking me.''

The mother of the prosecutrix testified that she was in the cotton patch picking with her husband, Dave Allison, Wm. Powell and some children; they were about 300 yards from the house. ''There was no obstruction between us and the house and could see the house from where we were picking cotton. My daughter was at the house cooking dinner. About 11 o'clock she came down to where we were picking cotton and was crying. Her clothes were torn nearly off of her and she was bloody all over in front. She told me Tommie Jones had been up there. I went on to the house and examined her and knew Tommie Jones had been there. My daughter's sickness was on her and had been before she was raped.''

Dave Allison, the father of prosecutrix, testified in regard to the fact that he and Powell and his wife and some children were picking cotton about 300 yards from the house when his daughter came down there crying about 11 o'clock. She told them that Tom Jones had been up there. This witness did not ask his daughter any question about it, but left for the house. He says he did not talk to her about the matter. He says, ''We were in sight of the house picking cotton and could have heard any one hallo. I didn't hear any disturbance up there at the house. I did not stop my girl from school last year to nurse the baby, but because she was being scandalized. I stopped her before this business came up.'' He denied having a conversation with Mr. Carmichael, a white man and merchant at Clayton, about two weeks before the grand jury met which indicted appellant for this offense, in which ''I told him I wanted this business to stop; that I didn't want it to go any further because I didn't believe my daughter had been raped. Tom Jones used to go with my daughter and I thought a lots of him then; don't like him now; would like to see him go to the penitentiary.'' This witness was contradicted by Mr. Carmichael, the white man above mentioned, in accordance with the predicate laid. This was the State's case.

Appellant introduced Seymore Roquemore, who says he saw the defendant on the day indicated about 12 o'clock going from his father's field in the direction of Mr. Cariker's store; he was in the public road walking; saw him going down the road and saw him go by and beyond the house indicated by prosecutrix. The witness says, I know he did not stop there. I came on behind him and saw him go

on a mile on the other side of Dave Allison's house going in the direction of Cariker's store.''

A white man by the name of Long testified he was mail carrier from Clayton, near where the offense occurred, on the day indicated, and left Clayton at 12:10 p. m. and met defendant coming from Cariker's store. It was then about 12:30. He had a conversation with defendant about getting witness some wood. Defendant had a bottle of snuff in his hands and said he was going home. Appellant proved by several witnesses a good reputation as a law-abiding negro boy, and that the prosecutrix's reputation for chastity was bad. On cross-examination by the State he stated, among other things, he heard the negro school teacher and other negroes living around there talking about prosecutrix. The negro school teacher was named Wallace. Nelson, a white man, testified to the good reputation of defendant. Another Nelson, the justice of the peace at Clayton precinct, testified also as to the general good reputation of appellant, and the general bad reputation for chastity of the prosecutrix. Carmichael, another white man, contradicted Dave Allison on the matters indicated in the predicate heretofore mentioned. Wallace, the negro school teacher, testified that such was his occupation, and that the prosecutrix had gone to school to him the first part of the year 1911. He says her reputation was bad for chastity. Laura Jones, mother of defendant, testified that on the day the offense is said to have been committed she was in her husband's field picking cotton; defendant and her other children were with her; they picked cotton until 12 o'clock and then went to the house. That defendant went on to the house with her. That they knew it was 12 o'clock for they always worked until they heard the whistles blowing for 12. On reaching the house she sent defendant to Cariker's store to get a bottle of snuff, and he left the house about 12 o'clock to go after the snuff. That defendant was in the field all the morning picking cotton with her. Powell was called in rebuttal by the State, and placed himself in the field with Dave Allison and the others where they were picking cotton at the time prosecutrix came into the field where they were. He said this was about 11 o'clock. When she came he looked up and saw she was crying; they were picking cotton about 300 yards from the house where prosecutrix was; that they could see the house and could have heard any one hallo or make any disturbance; that he did not hear any disturbance up there. When prosecutrix told her mother that appellant had been there ''I asked her if she was telling the truth. The reason I asked her that was because I didn't believe that she was telling the truth, but thought she was trying to work some trick. I knew Lemmie well and didn't believe what she said. Her clothes were not torn and there was just a little blood on her waist.'' He contradicted Dave Allison as to the time Dave Allison states he left the place where they were picking and went to the house. Bryant testified in rebuttal for the State that he was deputy sheriff of Panola County and lived at Clayton, and

knew all the parties. That he had occasion to go to Dave Allison's house on Saturday after the alleged rape was committed. "I made a close examination of Lemmie Allison from the waist up, examining her. I found no scratches or bruises on her body at all. Her sickness was on her," etc.

We are of opinion the evidence is not sufficient if the testimony of the prosecutrix is taken, as she states it, to be true. She says his left hand was around her but she did not know where his right hand was. "He got my drawers off but never got my dress above my knees. He did not get my legs apart but they were right close together all the time. * * * I know he went into me half way because my mama examined me and she told me so, and she also told me to swear that he went into me half way." It would be a very remarkable case of rape to be committed under the statement of this girl. How he could have committed rape with the girl's dress never above her knees and her legs not apart and kept closed all the time, would be a very peculiar rape, and especially in view of the fact she says her mother told her that he entered her half way up, and instructed her to so state. This character of testimony in the consummation of rape does not comport with human experience nor with the truth. Under our authorities we do not believe this evidence justifies the conviction. Dusek v. State, 48 Texas Crim. Rep., 519; Gazley v. State, 17 Texas Crim. App., 278; Montresser v. State, 19 Texas Crim. App., 281; Kee v. State, 65 S. W. Rep., 517; Adkins v. State, 65 S. W. Rep., 925; Donahue v. State, 79 S. W. Rep., 709. These are sufficient authorities upon this proposition.

Believing the evidence does not warrant a conviction of rape, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

PRENDERGAST, Judge (dissenting).—I do not agree to the reversal of this case on account of the claimed insufficiency of the evidence. I think the evidence was sufficient. The credibility of the witnesses and the weight of their evidence was a question for the jury.